679 So.2d 977 (1996)
STATE of Louisiana
v.
Byron MATTHEWS.
No. 95-KA-1245.
Court of Appeal of Louisiana, Fourth Circuit.
August 21, 1996.
*980 Arcenious F. Armond, Jr., Gretna, for Defendant/Appellant, Byron Matthews.
Harry F. Connick, District Attorney, Susan M. Erlanger, Assistant District Attorney, Orleans Parish, New Orleans, for Plaintiff/Appellee, The State of Louisiana.
Before CIACCIO, PLOTKIN and MURRAY, JJ.
MURRAY, Judge.
Byron Matthews appeals his conviction for second degree murder, asserting sixteen assignments of error. We find no reversible error and therefore affirm the conviction.
At about 7:45 p.m. on February 17, 1994, people in the area of Mirabeau and Piety Streets in New Orleans heard a gunshot, and several neighbors then found Huey "Peanut" Johnson lying halfway in the street, bleeding profusely. The victim told his mother and several others on the scene, including police officers, that "Corey Matthews' brother Byron shot me." An ambulance took Mr. Johnson to the hospital, accompanied by his mother and brother. He died about three hours later from a single gunshot that shattered his liver.

Assignments # 3, 4, 5, 6 and 13: Dying Declaration
In these assignments, Mr. Matthews asserts that the trial court erred in admitting the hearsay testimony of numerous witnesses concerning the victim's identification of him as the gunman. He further argues that the court's failure to instruct the jury on the standards for admissibility of a dying declaration and the State's burden of proof on this issue constitutes reversible error. In addition, Mr. Matthews complains that statements made during voir dire, by both the trial judge and the prosecutor, that Mr. Johnson's words had been judicially determined *981 to be a dying declaration improperly contributed to his conviction. Finally, he contends that prejudicial error occurred when the State incorrectly asserted during closing argument that no objection to this testimony had been made.
Louisiana Code of Evidence article 804 B(2) provides that a hearsay statement is admissible if it is "[a] statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death." Our Supreme Court has previously held that such a statement may be admitted as a dying declaration if made when the declarant is conscious of his condition and aware of his approaching demise, even if the statement is elicited by questions. State v. Verrett, 419 So.2d 455, 456-57 (La.1982) and cases cited therein. The victim need not express his awareness in direct terms; the necessary state of mind may be inferred from the circumstances surrounding the statement. State v. Henderson, 95-0267, pp. 5-6 (La.App. 4th Cir. 4/3/96), 672 So.2d 1085, 1089. The more serious the injury and the greater the impairment, the more probable is his belief that the end is near:
[N]o absolute rule can be laid down by which to decide with certainty whether the declarant, at the time of making his statement, really expected to die, yet when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making his statement died, the courts have uniformly held that the declarant really believed that death was impending, and his statement has been admitted as a dying declaration.
State v. Augustus, 129 La. 617, 619, 56 So. 551, 552 (1911).
Prior to trial, a hearing was held on Mr. Matthews' motion to suppress the hearsay evidence of Mr. Johnson's identification of his assailant. After hearing testimony from the victim's mother, the trial court concluded that the evidence was admissible. Mr. Matthews sought review of this ruling through a writ application, asserting that the State had not met its burden of proof under the dying declaration exception to the hearsay rule. However, this court denied the application, stating that "[o]n the showing made we decline to exercise our supervisory jurisdiction." State v. Matthews, 94-K-1399 (La.App. 4th Cir. 7/26/94) (unpublished). The Supreme Court similarly denied his application for a writ of review. State v. Matthews, 94-KK-2194 (La. 8/24/94), 642 So.2d 1271.
At trial, three residents of the general area of the shooting, Doris and Deshelle White (mother and daughter), Gerald Taylor, and Albert Tebault, as well as Carolyn Johnson, the victim's mother, testified concerning their arrival on the scene and Mr. Johnson's statements that Byron Matthews shot him. Police officers Chris Billiot and Tim Fitzpatrick corroborated this testimony, with Officer Fitzpatrick adding that when asked why he had been shot, the victim explained "he owed Byron a hundred dollars from awhile ago." This identification took place within thirty minutes of the shooting.
The witnesses also agreed that Mr. Johnson was found in a weakened condition and could barely speak. Although Mr. Taylor saw only a small spot of blood on the victim's shirt, Officer Fitzpatrick, who had a flashlight, testified that there was "a lot of blood" on the scene. Mrs. Johnson stated that her son was unconscious when she arrived, so she had to slap his face to wake him, but he was talking in the ambulance. Shortly before lapsing into unconsciousness for the last time, "Peanut" told his mother that he loved her. Dr. Richard Tracy, the pathologist who performed the autopsy, testified that Mr. Johnson sustained a single gunshot wound to the liver, resulting in "such a massive injury that he lost a lot of blood in a hurry." Although he survived for two or three hours after the shooting, this loss of blood was the cause of Mr. Johnson's death.
On this evidence, it is reasonable to conclude that Mr. Johnson believed that he was going to die when he identified Mr. Matthews as his assailant. Therefore, we find no error in the trial court's determination to admit hearsay testimony of the victim's statements into evidence.
Similarly, there is no merit to Mr. Matthews' contention that the failure to give his *982 requested jury charges regarding admissibility of this testimony was error. Because Article 104 of the Code of Evidence establishes that the trial court, not the jury, determines whether or not evidence will be admitted, the instructions regarding the criteria for a dying declaration and the state's burden of proof on the issue were properly excluded as incorrect. Furthermore, even though defendant's requested charge # 5 correctly instructs the jury that they may give a dying declaration whatever weight and effect they find it deserves, it also contains language improperly suggesting that the jury may determine admissibility of the testimony. Since this instruction is not wholly correct, it was properly rejected. La.Code Crim.Proc.Ann. art. 807; State v. Nuccio, 454 So.2d 93, 105 (La.1984); State v. Felo, 454 So.2d 1150, 1163 (La.App. 4th Cir.1984), writ denied, 488 So.2d 686 (La.1986). Although the trial court gave no charge specifically dealing with hearsay testimony, the jury was instructed on their role in determining the credibility and weight to be given to any witness' testimony, including their right to disbelieve all or part of such evidence. Thus, the substance of Mr. Matthews' requested instruction # 9 was adequately covered in the trial court's general charge. We therefore find no reversible error regarding the jury instructions.
Mr. Matthews next asserts that he was prejudiced by statements made throughout the trial by both the court and the prosecutor indicating that Mr. Johnson's identification had been determined to be a dying declaration. He thus argues that the jury was improperly led to believe that the victim's statements were admissible prior to their determination on this issue. He also contends that the State was allowed to discuss the specific facts of the case during voir dire.
It is well established that the scope of voir dire examination is within the trial judge's discretion and his rulings will not be disturbed in the absence of a clear abuse of that discretion. La.Code Crim.Proc.Ann. art. 786. In evaluating the fairness of these rulings, the entire examination must be considered. State v. Hall, 616 So.2d 664 (La. 1993); State v. Stucke, 419 So.2d 939 (La. 1982). We find no abuse of discretion in the record of voir dire before us.
The record does not support the defendant's arguments that improper references to the hearsay testimony were made throughout the trial. Instead, we find only that during voir dire, the prosecutor was allowed to define a dying declaration as a hearsay exception and to question prospective jurors about their ability "to listen to and judge ... a dying declaration." Defense counsel objected that the State was going into the specific facts of the case, but his objection was overruled. Later, Mr. Matthews' attorney was not only permitted to ask similar questions of the panelists, but to discuss the State's burden of proving Mr. Johnson's awareness of impending death. The district attorney objected to the latter, stating that "[w]e already had a hearing on that.... And this court has already found that what we are dealing with is a dying declaration." After an off-the-record bench conference, defense counsel was allowed to continue this line of inquiry. Other than during closing arguments, the phrase "dying declaration" was not used in the jury's presence again.[1]
Defense counsel's complaints on this issue rest primarily on his mistaken belief, previously mentioned, that the jury would play a role in determining the admissibility of the hearsay testimony. Although it is true that no appellate court had ruled on the issue, the trial court's ruling on admissibility was binding on the parties unless and until a different decision were rendered on appeal. State v. Fontenot, 550 So.2d 179 (La.1989). Therefore, the prosecutor's mention of the pre-trial determination in objecting to discussion of the standards for admissibility was wholly correct. While both attorneys' repeated use of the term "dying declaration" when addressing *983 the jury was unwarranted,[2] review of the transcript of this trial satisfies us that it was not so pervasive as to elevate this testimony above the other evidence presented. Therefore, because the State had the right to question whether the prospective jurors could accept testimony from another as to what the victim had said, the trial court did not err in permitting this questioning during voir dire.
In the final assignment of error concerning Mr. Johnson's statements, Mr. Matthews asserts that his conviction must be reversed based upon the following remarks during the State's closing argument:
Prosecutor: You heard during the course of this trialI've asked questions of witnesses. Defense attorneys asked questions of witnesses. I objected; they objected. "Objection, your honor, hearsay." "Sustained. Move on, counsel, you can't ask that question." But when we asked questions about the dying declarations, there was no objections [sic].
Defense counsel: Objection, your honor. That is absolutely untrue. There was a continuing objection to all statements concerning hearsay, which we preserved for the record. And to allow the trial to proceed, we purposely put it on the record so we wouldn't have to object to his examination every time someone made reference to it.
Prosecutor: I'll rephrase it, your honor.
The Court: Please do.
Prosecutor: The objection was not sustained by the judge. That information was allowed to come forward. You are to take that for what it's worth. It is a statement. You are to be the judge of the credibility of all of the witnesses who testified....
The court, in effect, sustained the objection but permitted the State to rephrase. Because defense counsel failed to further object or ask for an admonition or mistrial, he cannot now complain of error. La.Code Crim.Proc.Ann. art. 841; State v. Chambers, 95-0898, p. 12 (La.App. 4th Cir. 12/28/95), 666 So.2d 716, 723. Additionally, when taken in context of closing arguments and the trial as a whole, this improper remark[3] does not convince us that the jury was so influenced that it contributed to the verdict. See State v. Bates, 495 So.2d 1262, 1273 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987).

Assignments # 1 and 2: Defense Expert
In these two assignments, Mr. Matthews contends that the trial court erred in refusing to continue the trial based on the non-availability of a critical expert defense witness and in refusing to admit the expert's report in lieu of his testimony.
Code of Criminal Procedure article 709 provides:
A motion for a continuance based upon the absence of a witness must state:
(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial;
(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred; and
(3) Facts showing due diligence used in an effort to procure attendance of the witness.
The granting or denying of a motion to continue lies within the trial court's broad discretion. La.Code Crim.Proc.Ann. art. 712; State v. Martin, 93-0285, pp. 10-11 (La. 10/17/94), 645 So.2d 190, 196, cert. denied, ___ U.S. ___, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). Denial of a requested continuance is not grounds for reversal absent an abuse of discretion and a showing of specific prejudice. Id.; State v. Benoit, 440 So.2d 129 (La.1983); State v. Evans, 514 So.2d 588 (La.App. 4th Cir.1987), writ denied, 519 So.2d 113 (La.1988).
*984 On November 3, 1994, despite the State's objection, Mr. Matthews' counsel was granted a continuance of trial until January 24, 1995 based upon the unavailability of Dr. Vincent A. Papa, a forensic toxicologist. On January 19, 1995, counsel again moved for a continuance, stating his expert had informed him only three days earlier of another commitment. The trial court denied the motion, but counsel reurged it on the same grounds on the morning of trial. In denying any further delay, the court recalled that in November the January trial date was selected as a "firm" date, which should have been communicated to the expert witness. Under these circumstances, we find no abuse of discretion in the denial of further continuances.
Mr. Matthews also assigns as error the trial court's refusal to permit him to introduce Dr. Papa's report into evidence in lieu of the expert testimony. The State objected to the introduction of this report because defense counsel had not furnished a copy of the report prior to trial. However, since this assignment of error is not addressed in Mr. Matthews' brief on appeal, it is deemed abandoned. Rule 2-12.4, Uniform Rules, Courts of Appeal; State v. Garner, 621 So.2d 1203, 1210 (La.App. 4th Cir.), writ denied, 627 So.2d 661 (La.1993).
Mr. Matthews asserts that Dr. Papa's expected testimony concerning the effects of cocaine on a person's senses was critical to his defense. He contends that this testimony would have established that, because Mr. Johnson was under the influence of cocaine, his mention after the shooting of "Corey Matthews' brother Byron" was mistaken. Additionally, it is argued that the victim could not have been aware of the seriousness of his wound, casting doubt on the reliability of his statements as dying declarations. However, Dr. Tracy testified to the presence of cocaine in Mr. Johnson's system at death as well as the effects cocaine would have on a person's senses and memory. Additionally, defense counsel was permitted to elicit testimony from Lydell Rogers, the victim's brother, that Mr. Johnson "had a cocaine problem in the past." The issue was covered during closing arguments by the defense. Therefore, no prejudicial error occurred.
These assignments of error are without merit.

Assignments # 7, 8 and 14: Physical Evidence
In these assignments of error, Mr. Matthews asserts that the admission into evidence of a gun and a pawn ticket found in someone else's car, not connected to this crime, requires reversal of his conviction. He contends that the seizure and much-delayed search of the vehicle was illegal, and that since the gun was not shown to be the murder weapon, its presentation to the jury as belonging to Mr. Matthews was highly prejudicial. We find no merit to these arguments.
To be admissible, demonstrative evidence must be identified and authenticated. La.Code Evid.Ann. art. 901. A sufficient foundation is laid if it is shown that it is more probable than not that the object is the one connected to the case. State v. Frey, 568 So.2d 576, 578 (La.App. 4th Cir.1990), writ denied, 573 So.2d 1118 (La.1991). Once the foundation is laid, connexity is a factual question for the jury to decide, and the lack of a positive identification goes to the weight, rather than the admissibility, of the evidence. State v. Merrill, 94-0716, p. 9 (La.App. 4th Cir. 1/31/95), 650 So.2d 793, 799, writ denied, 95-0530 (La. 6/23/95), 656 So.2d 1012.
Because no spent casings were found on the scene, the police believed Mr. Johnson had been shot by someone in a car. Additionally, the autopsy later showed that he had been shot by someone more than two feet away. Deshelle White testified that as she and her mother first passed near the scene of the shooting, she saw another car approach Mr. Johnson, then slow down "on the side of Peanut and stop and look. And then the car went to the next block and made a left...." Officer Chris Billiot testified that Corey Matthews, the defendant's brother, approached him at the scene and said he had been with Mr. Johnson earlier, but did not witness the shooting. The officer obtained a description of Byron Matthews' vehicle, later learning that it was actually *985 owned by his aunt, Celeste Matthews. Albert Tebault testified that he had often seen Mr. Matthews driving that car, and that he called the police the next day when he saw the defendant park it and go into a nearby house. Since a warrant for Mr. Matthews' arrest had been issued, the police searched for the defendant, but did not find him. The car was impounded.
A search warrant was later obtained for the car, which had been held in the secured impound lot. On March 10, 1994, a search of the vehicle turned up an Intertech nine millimeter semi-automatic pistol, a magazine clip along with thirty-four Remington nine millimeter rounds, one live bullet found under the front seat, and a pawn ticket. Officer Kenneth Leary, Jr. of the firearms section of the police crime lab compared the two live, unfired nine millimeter Luger bullets that had been found a short distance from Mr. Johnson with a stock bullet he fired from the weapon seized from the car. Although the tests were inconclusive, this result is not uncommon with nine millimeter weapons. Officer Leary testified that the two live rounds could have been ejected from that gun. Additionally, he found that one of the two rounds was slightly compressed, indicating the gun had jammed and the bullet had to be manually ejected. Officer Leary was not able to make the gun found in the car malfunction. The live cartridge taken from under the car seat was, like the two found on the scene, a nine millimeter Luger.
On direct examination, the owner of B.J.'s Pawn Shop testified that the pawn ticket found in the car contained Byron Matthews' signature, showing that he had pawned an item on January 12, 1994. On cross, the owner stated that the ticket was for a .380 caliber pistol, not a nine millimeter.
The absence of a spent casing, the distance from which Mr. Johnson had been shot and Deshelle White's testimony all suggest that a car may have been used in this shooting. Mr. Johnson named Byron Matthews as the perpetrator, and both the pawn ticket and Mr. Tebault connected the seized vehicle to Mr. Matthews. Therefore, the police had probable cause to impound and search that car. A search warrant was first obtained, indicating that a gun and spent casing were the objects of the search because no casing had been found where Mr. Johnson was shot. The gun was found in the car Mr. Matthews used on a regular basis, and the live rounds had possibly been ejected from that gun. This testimony and evidence was thus sufficient to connect both the vehicle and the gun to the crime. Although circumstantial, the trial court did not err in admitting this relevant evidence.

Assignment # 10: Testimony of Mr. Tebault
In this assignment of error, Mr. Matthews complains that since the testimony of Albert Tebault was "absolutely incredible" and obvious perjury, the trial court should have granted his motion to strike. He further contends that the trial court erroneously limited his impeachment of this witness.
Deciding the credibility of witnesses is within the province of the jury, and such assessments must be upheld unless clearly contrary to the evidence. State v. Taylor, 95-0271, p. 5 (La.App. 4th Cir. 9/28/95), 662 So.2d 69, 73. In addition, the finder of fact may accept or reject all or part of a witness' testimony. State v. Allen, 94-1895, p. 7 (La.App. 4th Cir. 9/15/95), 661 So.2d 1078, 1084, writs denied, 95-2475, 95-2557 (La. 2/2/96), 666 So.2d 1087-88. Conflicting or inconsistent testimony goes to the weight given the evidence by the trier of fact. Id.
The primary basis for Mr. Matthews' claim of perjured testimony is that none of the other witnesses testified that Mr. Tebault was at the scene of the crime, but Mr. Tebault stated that he was the first to approach Mr. Johnson after the shooting. However, neither Mrs. White nor her daughter were specifically asked whether anyone was near Mr. Johnson when they first saw him; both testified, though, that it was very dark and they only saw the victim because he was wearing a white shirt. The Whites went into the next block to obtain assistance, then brought Mr. Taylor back to the scene after the police had been called. Mr. Taylor got out and learned the victim's name, after which Mrs. White and her daughter left to *986 find Mrs. Johnson. Mr. Taylor testified he was alone with Mr. Johnson only a few minutes before the police arrived, but that he had peered cautiously into the darkness while he waited and saw no one.
We do not find these descriptions of events to be inconsistent with Mr. Tebault's testimony that he had approached Mr. Johnson and moved him more to the side of the street, but when "they had a couple of other people came and the police," he left. In any case, the jury heard the testimony of all of these witnesses and was able to determine if Mr. Tebault's testimony was consistent with that of others on the scene. Any inconsistencies in this evidence were taken into consideration by the jury when it determined the weight and credibility to be given to each of the witnesses.
Mr. Tebault also testified that like others on the night of the shooting, he had heard Mr. Johnson identify Byron Matthews as his assailant. In addition, he described overhearing a conversation the next day in which the defendant told some other men that "The b___ should have paid me my money. I told him I was going to get him," after which one listener berated Corey Matthews for running away. Mr. Tebault said this took place on his street, near the middle of the block, but the court upheld the witness' refusal to give his address to clarify the location. However, when asked for the names of those to whom Byron Matthews made these statements, Mr. Tebault said, "No, they told me they don't want to be a part of it." After extensive discussion outside the presence of the jury, the trial court ruled that the defense was entitled to determine exactly where and to whom the defendant was speaking when the overheard conversation took place. Mr. Tebault now stated that it occurred in the 4900 block of Desire Drive, "by the shortcut."[4] Although Mr. Tebault said he recognized the men from the neighborhood, he now denied knowing their names or even nicknames, and later claimed that he could not provide the names because he had forgotten them.
Mr. Matthews claims that this contradictory testimony further establishes that Mr. Tebault perjured himself on the stand, and that denial of his motion to strike was thus reversible error. However, rather than establishing perjury, such contradictions are merely indicative of Mr. Tebault's inclination to protect his own perceived interests while testifying. It is the jury's function to consider such conflicting statements and apparent motives in weighing the credibility of a witness. See, e.g., State v. Allen, 94-1895, pp. 6-7, 661 So.2d at 1083-1084. The trial court did not err in denying the defendant's motion to strike Mr. Tebault's testimony.
Mr. Matthews next argues that the trial court erred in refusing to allow him to impeach Mr. Tebault regarding his motive for testifying. According to the defendant, his counsel should have been permitted to show that there was an outstanding capias for Mr. Tebault's arrest for his failure to appear in court on an unrelated matter. Since the bond for that charge was set at fifty thousand dollars, Mr. Matthews contends the testimony favorable to the State was "bought" by the promise to have that warrant cancelled.
Mr. Tebault stated that he came forward about the conversation he overheard because Mrs. Johnson asked him to, but he was testifying in court only because he was subpoenaed and was told he would go to jail if he did not appear. On cross, Mr. Tebault admitted pleading guilty to simple battery in 1993, and denied that he was released from jail or had any charges dismissed in exchange for his testimony. When defense counsel asked if he had subsequently been arrested in July 1994 "because you failed to show up for collection of fines and all the other things you were supposed to do," Mr. Tebault answered yes, and admitted that he was also charged with burglary at that time. Further questioning was not permitted, however, because the trial court ruled that only evidence of convictions, not arrests or prosecutions, are admissible for impeachment.
*987 Under Article 609.1 B of the Code of Evidence, a witness in a criminal case may not be questioned concerning "matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal." However, Article 607 D(1) permits a witness' credibility to be challenged by the introduction of extrinsic evidence of bias or interest. As this court held in State v. Smith, 591 So.2d 1219, 1225 (La.App. 4th Cir.1991), writ denied, 604 So.2d 995 (La.1992), "[t]his includes evidence of the existence of any agreement or deal with the State whereby the witness receives any benefit or gain in exchange for the testimony given." Before such evidence is admissible, however, the court must find that an agreement or deal was made. Id.
In this case, an extensive discussion was held outside the presence of the jury, during which the prosecutor denied knowledge of any pending charges or outstanding warrants for Mr. Tebault. Thus the defense failed to show any evidence of the alleged deal with Mr. Tebault. Nevertheless, at the conclusion of arguments, the trial court permitted counsel to file into the trial record the documentation showing that Mr. Tebault had an outstanding alias capias for a misdemeanor offense. Under these circumstances, no prejudicial error is established.

Assignments # 11 and 12: Prejudicial Comments
Mr. Matthews contends that his conviction must be reversed because both the trial court and the prosecutor made irrelevant and patently prejudicial remarks in the presence of the jury.
Mr. Matthews complains that just after the State tendered Mr. Tebault for cross examination, the trial court made reference to "other crimes" he committed:
I have to say this, and it's something I prefer not even getting into, but the defendant and, by the way, how do you read expressions? This unfortunate witness stated he didn't want to come. He was subpoenaed. And he has testified. And whereas in the beginning of the trial, the defendant has done nothing but(demonstrating). Now he's making direct glares at this unfortunate witness who does not want to be here. I think it would be smart for him to stop it. If something happens to him, he'll be back in court I presume. All right.
Defense counsel did not object to the court's comments at that time, but proceeded with cross examination of the witness. Not until the next morning, in connection with the argument concerning evidence of Mr. Tebault's outstanding capias, did Mr. Matthews' attorney state that "[b]ased on the comments made from the bench, without corroboration by the witness through any verbal manifestation of fear of testifying, etc., we feel that the comment was inappropriate and we seriously object to it. We would like that made a part of the record." No admonition was sought.
Since Mr. Matthews failed to make a contemporaneous objection, appellate review of the issue is precluded. La.Code Crim. Proc.Ann. art. 841; State v. Warner, 93-0216, p. 5 (La.App. 4th Cir. 7/27/94), 641 So.2d 684, 686, writ denied, 94-2517 (La. 1/27/95), 649 So.2d 379. Furthermore, we do not find the court's statements to be a reference to other crimes, as asserted here. See, e.g., State v. Allen, 94-1895, pp. 8-9, 661 So.2d at 1084-85; compare State ex rel. Whiticar v. Butler, 576 So.2d 515, 516 (La.1991) (trial court's characterization of defendant and counsel as perjurers necessitates reversal of conviction).
Mr. Matthews also contends that admonitions were required when the prosecutor commented on Corey Matthews' failure to testify at trial. During voir dire, the State twice questioned the panelists whether the failure to produce a reluctant witness, "especially if that person is the brother of the defendant or a family member who witnesses another family member commit a crime," would prejudice the prosecution. Defense counsel made no objection until a jury had been selected and removed from the courtroom, and did not respond to the trial court's offer that "if you have some instruction you want me to give the jury, maybe we can try that." Since there was no contemporaneous objection nor a request for an admonition, the defendant cannot complain of the alleged error on appeal. State v. Grant, 531 So.2d *988 1121, 1123 (La.App. 4th Cir.1988), writ denied, 567 So.2d 1117 (La.1990).
It is further argued that prejudicial error occurred when the State had Corey Matthews' name called as a witness, both in the courtroom and the hall, based on the prosecutor's misrepresentation that he had been subpoenaed for trial. Defense counsel immediately objected and a sidebar conference was held. Both the court and the prosecutor then agreed, in the presence of the jury, that "a review of the record clearly indicates that there's no service on any subpoena on Corey Matthews." Thus, while the trial court did not expressly rule on the objection, the error is not prejudicial as the prosecutor corrected the misstatement in front of the jury.
Mr. Matthews asserts that the following exchange during the State's closing argument also requires reversal of his conviction:
Prosecutor: Mr. Armond somehow thinks that he may be God. Because he sits here and tells us, "Huey Johnson was on cocaine. He couldn't have possibly have known what was going on [sic]. He had no way to believe that he was going to die."
Defense counsel: Your honor, that's a mischaracterization. I would object.
The Court: I'll make a statement on the mischaracterization. The one that Mr. Armond thinks he's God. I'm sure you don't.
Defense counsel did not seek an admonition or mistrial, precluding review of this alleged error. State v. Michel, 422 So.2d 1115, 1120-21 (La.1982); State v. Grant, 531 So.2d at 1123. Additionally, even if the remarks were improper, the statements were not such as to convince this court that the jury was influenced and the verdict tainted. State v. Bates, 495 So.2d at 1273.
Accordingly, these assignments of error are without merit.

Assignments # 9, 15 and 16: Sufficiency of Evidence/Denial of New Trial
Mr. Matthews contends that the State failed to produce sufficient evidence to prove beyond a reasonable doubt that he was the person who killed Mr. Johnson. He also argues that the trial court erred in denying his motions for a judgment of acquittal and for a new trial, and asks this court to review for errors patent.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La. App. 4th Cir.1991). The reviewing court must consider the record as a whole, not just the evidence favoring the prosecution, since that is what a rational trier of fact would do. State v. Mussall, 523 So.2d 1305 (La.1988). However, an appellate court need not decide whether it believes the witnesses or if the conviction is supported by the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.Rev.Stat.Ann. § 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
La.Rev.Stat.Ann. § 14:30.1 defines second degree murder as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." Specific intent "exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences *989 to follow his act or failure to act." La.Rev.Stat.Ann. § 14:10(1).
In this case, Mr. Johnson identified Byron Matthews as the person who shot him in statements overheard by several witnesses. Additionally, Officer Fitzpatrick's testimony that Mr. Johnson said he was killed because he owed Mr. Matthews money reveals an intent on the part of the defendant to kill or inflict great bodily harm. Thus, even if the jury accepted the defendant's arguments that Mr. Tebault was not worthy of belief, sufficient evidence was introduced to prove beyond a reasonable doubt that Byron Matthews was guilty of the second degree murder of Huey Johnson.
Mr. Matthews' arguments regarding his motions for a post-verdict judgment of acquittal and for a new trial both rest upon his previously addressed assertions that the evidence does not support the verdict and that the errors assigned on appeal prevented a fair trial. However, our review has established that the jury's verdict is supported by the law and evidence, and that no prejudicial error occurred. Therefore, the trial court did not abuse its discretion in denying the post-trial motions. La.Code Crim.Proc.Ann. arts. 821, 851; State v. Griffon, 448 So.2d 1287, 1293 (La.1984); State v. Del Carpio, 537 So.2d 377, 380 (La.App. 4th Cir.1988), writ denied, 541 So.2d 871 (La.1989).
In this appeal, Mr. Matthews has mentioned several other alleged errors which occurred in this case. He asserts that when combined with those addressed in his assignments of error, the erroneous rulings and misstatements prevented him from obtaining a fair trial. We have reviewed these errors and found them to be without merit individually, and further find that the combined effect of the asserted errors did not deprive Mr. Matthews of a fair trial. State v. Graham, 422 So.2d 123, 136-37 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).
A review of the record for errors patent reveals none.
Accordingly, the defendant's conviction and sentence are affirmed.
AFFIRMED.
PLOTKIN, Judge, concurring.
A foundation was not laid to establish that it was more probable than not that the weapon was connected to the crime. Therefore, the trial judge's ruling that the weapon was relevant was incorrect and a clear abuse of discretion. I concur, however, because the error was harmless. The evidence against the appellant is overwhelming and the prejudicial value of this item is slight.
More troubling is a comment made by the trial judge which exceeded the confines of judicial propriety. At trial, in the presence of the jury, the trial judge stated the following:
I have to say this, and it's something I prefer not even getting into, but the defendant and, by the way, how do you read expressions? This unfortunate witness stated he didn't want to come. He was subpoenaed. And he has testified. And whereas in the beginning of the trial, the defendant has done nothing but(demonstrating). Now he's making direct glares at this unfortunate witness who does not want to be here. I think it would be smart for him to stop it. If something happens to him, he'll be back in court I presume. All right.
The trial judge, by so commenting on the defendant's demeanor in the presence of the jury, impugned the character of the defendant and bolstered the credibility of the State's witness. Cf. State v. Roberts, 541 So.2d 961, 964-65 (La.App.2d Cir.1989). This can be nothing other than clear error and a clear abuse of discretion.
Within its context and under the circumstances of this case, however, which include an archetypal dying declaration, I find that the comment, although improperly made, did not influence the outcome. Accordingly, the error was harmless.
NOTES
[1] Because the jury decided the question of guilt, whatever was said outside the presence of the jury is irrelevant to this appeal. We therefore decline to address the defendant's complaints in this regard.
[2] Once hearsay or any other evidence is ruled admissible, neither the standards for its admissibility, the legal terminology by which it is referenced, nor whether an objection was lodged and/or overruled is relevant to the jury's consideration. Instead, the only issue to be argued is its reliability, weight and effect, either alone or in conjunction with other evidence.
[3] See footnote 2, supra.
[4] We note that since Mr. Tebault's address is shown on the State's witness list as being in the 4900 block of Desire Street, there is no contradiction in his descriptions of where this conversation was overheard.